

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-14-2004

# Mickens-Thomas v. Vaughn

Precedential or Non-Precedential: Precedential

Docket No. 03-3714

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Mickens-Thomas v. Vaughn" (2004). *2004 Decisions.* Paper 1046.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/1046

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed January 14, 2004

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 03-3714

LOUIS MICKENS-THOMAS,

Appellant

v.

DONALD VAUGHN; PENNSYLVANIA BOARD OF
PROBATION AND PAROLE, THE PENNSYLVANIA
BOARD OF PARDONS; THE ATTORNEY GENERAL
OF THE STATE OF PENNSYLVANIA

Appeal from the United States District Court
For the Eastern District of Pennsylvania
D.C. No.: 99-cv-06161
District Judge: Honorable Ronald L. Buckwalter

Argued: December 15, 2003

Before: SLOVITER, McKEE, and ROSENN, *Circuit Judges.*

(Filed: January 14, 2004)

Leonard N. Sosnov (Argued)
1027 Abington Avenue
Wyndmoor, PA 19038

*Counsel for Appellant*

Francis R. Filipi (Argued)
Office of Attorney General
 of Pennsylvania
Strawberry Square, 15th Floor
Harrisburg, PA 17120

*Counsel for Appellees*

---

**OPINION OF THE COURT**

---

*ROSENN*, Circuit Judge.

This prolonged parole proceeding had its inception when the Pennsylvania Board of Pardons (Pardons Board) recommended to the Governor of Pennsylvania in 1994 that he commute the life sentence of Louis Mickens-Thomas (Thomas). The Governor commuted the sentence. Thereafter, Thomas made several applications for parole, each of which the Pennsylvania Board of Probation and Parole (Board or Parole Board) denied. After exhausting all administrative relief in the State, including appellate court relief, Thomas applied to the United States District Court for the Eastern District of Pennsylvania for a writ of habeas corpus.

The Court found that the Board had violated the *ex post facto* provision of the federal Constitution. *Mickens-Thomas v. Vaughn*, 217 F. Supp. 2d 570 (E.D. Pa. 2002). The Court granted Thomas conditional relief of habeas corpus and remanded his parole application to the Board for further hearing under parole laws and guidelines that existed prior to their amendment in and after 1996. The Board appealed to this Court and we affirmed. *Mickens-Thomas v. Vaughn*, 321 F.3d 374 (3d Cir.), *cert. denied sub nom. Gillis v. Hallawell*, 124 S. Ct. 229 (2003)(*Mickens-Thomas I*).

In *Mickens-Thomas I*, we thoroughly reviewed the Board proceedings and issued a mandate instructing the Board to rectify its *ex post facto* violations and give Thomas "fair consideration" under the Pennsylvania parole laws and guidelines in existence prior to 1996. Relying on the existing record and without conducting any further hearing, the Board denied Thomas's parole application for the fourth

time on remand from the District Court. Thomas again sought relief in the District Court, which found continuing violations by the Board and noncompliance with our instructions. Nonetheless, the District Court refrained from granting Thomas's request for unconditional habeas corpus relief. It summarily concluded that the Board had weighed "all factors militating for and against parole" and that it could not substitute its judgment for that of the Board. Thomas timely appealed. We vacate and remand to the District Court with instructions to direct Donald Vaughn, Superintendent of the Pennsylvania State Correctional Institution at Graterford, and the Parole Board to release Thomas on parole.

## I.

In an effort to put this opinion in perspective, we review our previous decision in this case.

### A. *Commutation of Thomas's Life Sentence (1995)*

Thomas, now 75 years old, has been incarcerated for 39 years in a Pennsylvania penitentiary for his conviction in 1969 of the first-degree murder of twelve-year-old Edith Connor.[1] He was sentenced to life imprisonment, ineligible for parole under Pennsylvania laws. Despite his conviction, he has consistently maintained his innocence since his incarceration. In 1993 Thomas first applied to the Pardons Board for a commutation of his life sentence. In 1994 the Pardons Board unanimously recommended the commutation to the Governor. The Pardons Board noted

---

1. Thomas was arrested on October 15, 1964, and charged with the murder of Connor on September 19, 1964. His initial trial resulted in a conviction on first-degree murder charges. That conviction was vacated in 1967 upon discovery that the Commonwealth's lead witness, a technician who matched fibers and debris from Thomas's shoe repair shop to those found on the girl's body, had falsified her credentials and perjured herself in another case. *Mickens-Thomas I*, at 376 n.3. He was again convicted in 1969 for first-degree murder based entirely on the testimony of Dr. Edward J. Burke, the then director of the Pennsylvania Police Department Laboratory, who corroborated the discredited technician's testimony and vouched for the correctness of her testimony. *Id.*; *Commonwealth v. Thomas*, 202 A.2d 352, 354 (Pa. 1972).

Thomas's attainment of a college degree, his participation in Alcoholics Anonymous, his participation in sex offender therapy, the support of the Pennsylvania Corrections Department, the long length of time served, the numerous recommendations from scholars, religious and community leaders, and his overall maturity and stability. *Mickens-Thomas I*, at 377. On January 14, 1995, Governor Robert Casey granted commutation, commuting Thomas's life sentence to a term of "31 years, 9 months, 6 days to life," making him eligible for release on parole on July 21, 1996.

B. *Parole Board's Initial Refusal to Consider Thomas's Parole Application (1996)*

The Board initially refused to consider Thomas's parole application filed on July 22, 1996, one day after he became eligible for parole, by relying on a newly enacted statute, 61 Pa. Stat. Ann. § 331.34a (West 1995), which made an applicant in Thomas's situation ineligible for parole without having served a year in a pre-release center. *Mickens-Thomas I*, at 380; *Mickens-Thomas*, 217 F. Supp. 2d at 574. On November 26, 1996, Thomas filed a mandamus action to challenge the Board's refusal to consider his parole application with the Commonwealth Court of Pennsylvania. *Mickens-Thomas v. Commonwealth, Board of Probation & Parole*, 699 A.2d 792 (Pa. Commw. Ct. 1997). The Board conceded in that action that the new statute could not be retroactively applied to Thomas's application. The state court reversed the Board's determination of parole ineligibility and ordered the Board to accept and consider Thomas's parole application within 10 days of the court's order. The court, however, denied Thomas's request for an order compelling the Board to release him on parole. Because every effort by Thomas to obtain favorable parole action from the Board encountered its utmost resistance, it is reasonable to infer that Thomas's successful appeals to the Commonwealth Court incurred the ire of the Board.

C. *Board's First Denial of Thomas's Parole Application (1997)*

Pursuant to the Commonwealth Court's order, the Board considered Thomas's parole application on August 21, 1997, but summarily denied it. The Board denied the

application even though its Guidelines recommended his release on parole and all voting Department of Corrections institutional staff, including the prison counselor and housing officer, recommended his release. *Mickens-Thomas I*, at 380-81. In its decision, the Board urged Thomas to secure the following before his next scheduled parole application review in 1998: investigation of a home plan; the availability of out-patient sex offender treatment; participation in a program plan prescribed by Department of Corrections officials; maintenance of a good conduct record; a continuing institutional recommendation for parole; and an evaluation by mental health professionals experienced with sex offenders. *Id.* "The Board made these recommendations in spite of Thomas's apparent compliance with all of the Board's suggestions prior to the hearing." *Id.*

### D. *Board's Second Denial of Thomas's Parole Application (1998)*

Before the Board considered Thomas's second parole application in March 1998, he had complied with all of the Board's suggested requirements stated in its 1997 decision. He maintained the positive recommendation of corrections authorities, who once more unanimously recommended his release and noted that he was in compliance with treatment programs. The prison counselor, corrections officer, and psychologist all endorsed his release. He continued to participate in a sex offender therapy program along with an Alcoholics Anonymous program. Post-release support networks were in place. Once again, the Guidelines relied on by the Board assigned Thomas a risk-assessment score that favored release. *Mickens-Thomas I*, at 381-82. Despite his compliance with essentially all of the Board's conditions, the Board again summarily denied parole in March 1998. In this second denial of Thomas's parole application, the Board again advised Thomas to seek counseling and treatment, participate in prescribed programming, maintain a clean record, and obtain institutional recommendation for purposes of his next scheduled parole application. Unlike the 1997 decision, the 1998 decision *recommended no specific sex offender treatment.* Moreover, despite the comment that Thomas needed "counseling and treatment," psychiatric and

psychological evaluations did not contraindicate his release. *Id.* at 382.

E. *Board's Third Denial of Thomas's Parole Application (2000)*

Before the Board considered his next scheduled parole application, Thomas filed the underlying federal habeas action in December 1999. Shortly thereafter, the Board denied Thomas's parole application in March 2000 for the third time. The Board gave as its reason the cryptic statement that it "[had] determined that the mandates to protect the safety of the public and to assist in the fair administration of justice cannot be achieved through [his] release on parole." *Mickens-Thomas I*, at 382. The Board denied parole once again, even though all voting members of the Department of Corrections institutional staff, including Thomas's counselor and work supervisor, unanimously recommended his parole. Again, he demonstrated a continued record of good conduct in prison and participation in sex offender therapy and all other programs prescribed by the Department of Corrections. *Id.* Despite all the recommendations and Thomas's continuous record of good conduct, the Board once again advised him to maintain his Department of Corrections recommendation as a precondition for consideration at the next scheduled parole hearing in 2002.

New to this third denial was the Board's classification of Thomas on the Guidelines form as a "habitual substance abuser." This increased his risk score by 2 and placed him for the first time in an unfavorable category for release.[2] *Id.* at 383. The Board made the classification for the first time based on Thomas's *alcohol* abuse prior to his conviction almost 40 years ago. The Board assigned this classification although Thomas had not abused alcohol throughout his incarceration and had consistently participated in Alcoholics Anonymous. *Id.* We questioned "why, if past alcohol abuse over forty years ago was a relevant factor, it had not been considered on his two prior Guidelines

---

2. Our earlier opinion stated that the classification of "habitual substance abuser" increased Thomas's risk score by 3. The number should have been 2.

evaluations." *Id.* Also new to this third denial was the increased risk score of 2, instead of 1, for the category of "victim injury" as a result of a modification of the Guidelines. Because of these new and modified risk factors, the Guidelines-based tally of risk scores for the first time counseled against granting parole despite Thomas's record of continued good behavior and the unanimous support for his parole from the Department of Corrections institutional staff, including his counselor and work supervisor.

## II.

### A.

In our earlier opinion, we affirmed the District Court's grant of conditional habeas relief upon finding systematic *ex post facto* violations by the Board in applying newly amended Pennsylvania parole laws and guidelines to Thomas's parole applications. We noted that prior to the amendment in 1996, the Pennsylvania parole statute emphasized "the value of parole as a disciplinary and corrective influence" and the society's interest in rehabilitating inmates. *Mickens-Thomas I*, at 377-78 (quoting the 55-year old parole statute, Pa. Cons. Stat. § 331.1 (West 1941-1996)). We also noted that after 1996, the emphasis of Pennsylvania's parole statute had shifted to an overriding consideration of public safety. *Id.* at 377 (quoting the amended Pa. Cons. Stat. § 331.1 (West 1996) (mandating that the parole "board shall first and foremost seek to protect the safety of the public")).

We further noted that the Board's Guidelines and parole policies had changed correspondingly with the amended parole statute. Before 1996, the Board's internal policies stated that the Board must weigh "numerous factors" balancing the inmate's rehabilitation and liberty interest with the interest of public safety. *Id.* at 378. Specifically, we noted that the Board's 1989 Manual of Operations and Procedures recognized that "[p]robation and parole services *must* consider that offenders can change their behavior patterns when desirous, capable, and given the opportunity, help, dignity, and respect they deserve as

human beings." *Id.* (emphasis added). We also noted that in the 1990 Parole Decision Making Guidelines, the Board stated that "[a]n eligibility of parole expresses a *philosophy of presumed release* unless information reviewed demonstrates by its preponderance that the public safety interests of the community outweigh the liberty interests of the inmate." *Id.* (emphasis added).

In response to the amended parole statute in 1996, we saw that the Board substantially revised its guidelines by emphasizing that "the foremost concern for the Board must be the protection of the public." *Id.* at 380 (quoting the Board's Fiscal Years 1995-1997 Biennial Report). On the basis of undisputed Board documentary evidence, we concluded that in the wake of the 1996 amendment to the state parole statute, the Board had altered the weight it applied to public safety considerations in making parole decisions:

> The record is convincing that after 1996, the Board applied to the public safety interest far greater weight. The evidence here demonstrates that since 1996, the Board has given special weight to the risk to public safety. Pre-1996, a prisoner could be denied parole because of public safety concerns only if those concerns together with other relevant factors outweighed, by a preponderance, the liberty interests of the inmate. The 1996 policy change placed first and foremost the public safety to the disadvantage of the remaining liberty interest of the prisoner.

*Id.* at 385.

## B.

We held in our earlier opinion that the Board had violated the constitutional prohibition against *ex post facto* laws in its treatment of Thomas's first three parole applications. The Board had thrice denied Thomas's application even though he had unanimous support from the corrections officers, consistently maintained a record of good behavior, participated in sex therapy and alcohol abuse prevention programs, and complied with all of the Board's requirements. The Board had urged Thomas to

undergo a psychiatric examination when it denied his first application in 1997 despite the existence of pre-commutation 1993 psychiatric reports supporting Thomas's parole and the existence of other psychological evaluations in his file that did not contraindicate release.[3] *Mickens-Thomas I*, at 381. Additionally, although a 1996 psychological evaluation of Thomas showed an "antisocial personality" and "possible sexual preoccupation and psychosexual immaturity," the Board was not deeply concerned with that report in its decision-making worksheet. *Id.* Significantly, the Board's 1998 denial decision, unlike its 1997 decision, did not recommend any specific sex offender treatment. None of the existing psychiatric and psychological evaluations, including the 1996 evaluation, contraindicated his release. *Id.* A 1998 psychological evaluation determined Thomas to be an "average risk candidate" and the Department of Corrections psychologist noted "No Psychological Contraindications" for release in the 1998 Vote Sheet. *Id.*

We observed that following Thomas's initiation of the underlying federal habeas action in December 1999, the Board's method of evaluating Thomas's parole application took a significant change in March 2000. For the first time, the Board classified Thomas as a "habitual substance abuser" for his *alcohol* abuse 40 years ago. *Id.* at 383. For the first time, the risk score of the category of "Victim Injury" was increased from 1 to 2 points. *Id.*

On the basis of the above undisputed evidence, we held in *Mickens-Thomas I* that the Board had committed an *ex post facto* violation by retroactively applying the amended parole laws and guidelines to Thomas's applications. We observed that "there [was] significant evidence that [the Board] acted upon policies that were established after [his] crime and conviction." *Id.* at 387. Although the Board was entitled to discretionary judgment in making parole determinations, the exercise of that judgment was

---

3. A 1993 report called Thomas "a good candidate for commutation from the psychological perspective," and another 1993 psychiatric report added that Thomas "[had] developed significantly during his years of imprisonment." *Mickens-Thomas I*, at 382.

circumscribed by constitutionally permissible perameters. There was no question that Thomas was entitled to "have the Board give genuine consideration and due regard to the factors prescribed by the Board's pre-1996 policies." *Id.*

We concluded that "it [became] evident that, although the risk of potential danger to the public [had] always been a factor, it became the controlling feature of the Board's decision after 1996." *Id.* at 388. "The Board defaulted [therefore] in its duty to consider factors other than the underlying offense and risk to public safety; it [had] failed to address any of the factors favoring release." *Id.*

We described the statistical evidence as "staggering," noting that in 266 simultaneous instances of commuted life sentences, Thomas was the only one not granted parole within the first two attempts. *Id.* at 385, 387. It "strongly confirm[ed] the change in policy [since] 1996." *Id.* at 385. Historically, "the gubernatorial grant of commutation of sentence had such significance that the Board agreed to parole every commutee on his or her first or second application." *Id.* at 385. We determined that "[t]he Thomas application [was] distinguished from [those] 266 cases only by the intervening policy directive of 1996, emphasizing public safety." *Id.* We accordingly affirmed the District Court's order remanding Thomas's parole application to the Board for review under the pre-1996 parole standards. *Id.* at 393.

In our remand mandate, we provided the Board with guidelines to rectify its constitutional violations. We informed it that

> prior to 1996, the Board's concern for potential risks to public safety could not be the sole or dominant basis for parole denial under the existing Guidelines. Considerations of public safety were already incorporated into its Guidelines analysis; the Board had to point to "unique" factors as a basis for its rejection of the Guidelines. Moreover, the Board had to weigh all factors, militating for and against parole, and make its decision on the totality of the factors pertinent to parole, and give appropriate weight to the interests of the inmate. Heavy foot application on one factor

could not have been the basis of granting or rejecting parole.

*Id.* at 386. We advised the Board that it could not shield itself from constitutional violations by relying on the "discretionary component" of its parole review. *Id.* at 386-87. We rejected "the Board's reasoning [that its] determination, founded on newly discovered experience, could, by virtue of the Board's exalted discretion, forever deny a prisoner's preexisting right to parole consideration." *Id.* at 387. "Although some discretion might still exist within the pre-1996 parameters, a parole decision that fails to address any of the criteria mandated by Board policy, such as institutional recommendations, willingness to undergo counseling and educational achievement, and instead utterly ignores all factors counseling in favor of release, falls outside of the realm of the legitimate exercise of discretion under the pre-1996 policies." *Id.*

## C.

In our earlier opinion, we specifically instructed the Board to rectify the unconstitutional manner in which it used certain historical factors retroactively to achieve a predetermined result of parole denial.

### 1. *Prior history of alcohol abuse*

We observed that Thomas had a record of alcohol abuse, but not drug abuse, prior to his conviction in 1964 and that he had consistently attended Alcoholics Anonymous while in prison. *Mickens-Thomas I,* at 383, 390. The Board did not assign any risk score for his prior history of alcohol abuse in its 1997 and 1998 decisions. *Id.* at 383. For the first time in its 2000 decision, the Board assigned a risk score of 2 for Thomas's alcohol abuse almost 40 years ago "despite no changes in his situation." *Id.* We questioned "why, if past alcohol abuse over forty years ago was a relevant factor, it had not been considered on his two prior Guidelines evaluations." *Id.* We decided that the Board's use of Thomas's prior history of alcohol abuse was a *post hoc* rationalization "designed to achieve" a denial of Thomas's parole under the new regime of parole laws and guidelines. *Id.* at 390. "There is no evidence that alcohol

abuse should, suddenly, as of the 2000 report, be given such significance: The Guidelines recommendation in 2000 is not worthy of consideration because it appears to have been deliberately designed to achieve a non-parole decision." *Id.*

> 2. *Non-admission of guilt and non-participation in the "admitter" part of sex offender therapy program that requires admission of guilt*

Although the Board was concerned in the past by Thomas's participation in the "deniers" group of the sex therapy program, the Board's prior decisions, including the 2000 one, made no specific mention of the "admitter-denier" distinction and the Board's internal notes regarded Thomas's consistent denial of guilt in a "neutral" way. *Id.* at 381-82, 381 n.12. Specifically, we noted that the Board's internal files accompanying its 1997 and 2000 decisions merely commented, in a neutral way, that Thomas participated only in "denier" sex therapy and denied guilt for his crime without further comment or discussion of how these factors may have outweighed others favoring release. *Id.* at 389. "Significantly, the Board in 1997 and 1998 failed to mention lack of responsibility (or any other factor) in the section of the Guidelines worksheet where specific space [was] allotted to provide unique reasons for departing from a Guidelines recommendation." *Id.* "Moreover, the recommendation that Thomas receive [the "admitter" part of] sex offender therapy, which appeared on the 1997 report, did not appear on the 1998 Decision or worksheet. Then, inexplicably, the recommendation for sex offender therapy reappeared on Thomas's 2000 parole-refusal report." *Id.*

Only when the Board was forced to defend Thomas's charges of constitutional violations in the underlying federal habeas action did it assert, for the first time in its earlier brief to us, that Thomas's nonadmission of guilt and consequent failure to complete the part of the sex offender therapy program that required admission of guilt counseled against his release. *Id.* We observed that there was no evidence that the Board had ever properly communicated to Thomas its "renewed concern" over his participation only in the "denier" part of sexual offense therapy "given that the

reasons for denial in the Board Decision [were] vague and boilerplate." *Id.* We determined that the Board's *post hoc* or retrospective use of the factors of Thomas's nonadmission of guilt and his nonparticipation in the "admitter" part of sex offender therapy to justify its parole denial "cast[ ] still more doubt on the genuineness of the [Board's] concern." *Id.*

### 3. *"Instant offense" and "victim injury"*

We held that the Board committed *ex post facto* violations by relying on the factors of "instant offense," that is, the rape and murder charges of which Thomas was convicted, and "victim injury" to the exclusion of consideration of Thomas's rehabilitation interest. Instead of using the balancing approach required under the pre-1996 regime of parole laws and guidelines, the Board had relied "primarily [on] the nature of the original offense" in denying Thomas's applications "despite many other significant factors favoring parole." *Id.* at 388. "Given its indifference to Thomas's efforts to improve his parole candidacy, and its repeated reliance on Thomas's 'instant offense' and his potential for future 'assaultive behavior,' despite the Guidelines' finding that Thomas was not a recidivism risk, the Board appeared to rely exclusively on the nature of the underlying offense and the potential danger to the public if Thomas were released." *Id.* at 388-89.

We found further *ex post facto* violations in the Board's application of enhanced risk penalty for the factor of "victim injury" to Thomas's applications. "The new Guidelines, implemented between 1998 and 2000, placed more weight on 'Victim Injury.' " *Id.* at 386 ("The 2000 Board Decision denying Thomas's parole noted that its action was consistent with the Board's '*mandate*' to protect the public. This language did not appear on earlier Board decisions and reflects its new parole policy.") (emphasis in original). We were convinced that the Board's "new valuation" of the category of "victim injury," evidenced by the assignment of 2 risk points to Thomas's 2000 application, instead of the 1 point assigned to his first two applications for the same category, "further evidence[d] the advent of new policies and emphasis on public policy on the part of the Board." *Id.* at 390 n.16. We decided that "[t]he Board [had] defaulted in

its duty to consider factors other than the underlying offense and risk to public safety" and "[had] failed to address any of the factors favoring release." *Id.* at 388.

### D.

Our mandate to the Board to rectify its *ex post facto* violations could not be clearer in the following paragraphs of our opinion:

> The pre-1996 policies place significant weight on factors relating to an inmate's potential to adapt to life on the outside, and on the recommendations of the institutional staff. The pre-1996 policies suggest that no single factor should be controlling in a decision to deny parole to an applicant. Moreover, the pre-1996 Decision Making Guidelines were given significant, although not dispositive weight. A departure from the Guidelines required a recitation of *unique* factors, outweighing those in the Guidelines analysis. The Board Decisions on each of Thomas's parole hearings rely heavily on "high assaultive behavior potential," which relates primarily to the nature of the original offense, despite many other significant factors favoring parole.

*Id.* at 388 (emphasis in original).

We cautioned the Board that, on remand,

> The Board will not be defensive, but instead will fairly consider Thomas's application in the light of our observations and Ex Post Facto prohibitions. If the Guidelines recommend release, the Board should fairly consider the weight of this recommendation. A decision contrary to a Guidelines recommendation must be buttressed by *unique factors* which outweigh the Guidelines endorsement. Moreover, release on parole is a Board policy presumption, and parole should be granted unless countervailing negative factors affirmatively outweigh reasons supporting release.

*Id.* at 393 (emphasis added).

## III.

### A.

None of the parties dispute that the District Court had subject matter jurisdiction over the underlying habeas action under 28 U.S.C. §§ 1331, 2241 and 2254(a), and that we have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253. However, on this appeal, the Board, citing 28 U.S.C. § 2253(c)(1) and *Coady v. Vaughn*, 251 F.3d 480, 486 (3d Cir. 2001), argues that we should dismiss Thomas's appeal because he has not obtained a certificate of appealability from either the District Court or this Court.[4] The Board's argument has no merit; on the same page of our *Coady* opinion relied on by the Board, we construed a timely filed notice of appeal as a request for a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1) and Fed. R. App. Proc. 22(b)(2).[5] *Coady*, at 486. It is not disputed that Thomas filed a timely notice of appeal from the District Court's latest decision, and we construe his timely filed notice of appeal as a request for a certificate of appealability. Of utmost importance, this Court has continuing jurisdiction over this appeal to determine whether the Board has complied with the District Court's remand order and our remand mandate. *See Phifer v. Warden*, 53 F.3d 859, 861 (7th Cir. 1995) ("[A] district court

---

4. 28 U.S.C. § 2253(c)(1) (1996) provides:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

> (B) the final order in a proceeding under section 2255.

5. Federal Rules of Appellate Procedure 22(b)(2) (1998) provides:

> A request addressed to the court of appeals may be considered by a circuit judge or judges, as the court prescribes. If no express request for a certificate is filed, the notice of appeal constitutes a request addressed to the judges of the court of appeals.

retains jurisdiction to determine whether a party has complied with the terms of a conditional order.").

Where the District Court conducted no evidentiary hearing and made no new findings of fact as to Thomas's motion to enforce the Court's previous grant of conditional habeas relief, we review *de novo* the District Court's legal conclusion that the Board has essentially complied with our mandate to the Board to rectify its constitutional violations. *See Rios v. Wiley*, 201 F.3d 257, 262 (3d Cir. 2000) (in a federal habeas corpus proceeding, the Court of Appeals exercises plenary review over the District Court's legal conclusions); *Lambert v. Blackwell*, 134 F.3d 506, 512 (3d Cir. 1997); *Barden v. Keohane*, 921 F.2d 476, 479 (3d Cir. 1990) (the Court of Appeals exercises plenary review over the District Court's legal conclusions which formed the basis of the Court's denial of the habeas corpus petition).

## B.

Following the issuance of our mandate in *Mickens-Thomas I*, the Board did not conduct any hearing or call any witness. It did not consider any "unique factors" that were not already incorporated in its prior-1996 Guidelines. Instead of balancing factors favoring parole with unique factors that may weigh against parole, the Board considered the same old factors in the same manner found by us to be violative of the *ex post facto* prohibition in our earlier opinion.

### 1. Prior history of alcohol abuse

The Board defied our instruction to discontinue its pretextual use of Thomas's alcohol abuse 40 years ago and once again relied on that factor as a *post hoc* defense of its unconstitutional method of reviewing Thomas's parole applications.[6] The Board ignored our inquiry pertaining to

6. The Board wrote:

> Your history of substance abuse (alcohol) which has led to police arrests and has resulted in several instances of assaultive sexual behavior directed towards women and children. The record also reflects that you had been drinking on the morning and the night before you murdered Edith Connor.

Board's Decision, III (1), at 2, A30.

the relevance of this 40-year-old factor. The Board failed to consider, as we expressly required it to do, whether Thomas should be deemed to have been rehabilitated with his *present* history of sobriety for 40 years in prison, his consistent participation in Alcoholics Anonymous, and his compliance with the prison's alcohol abuse prevention programs.

The Board has in fact foreclosed any possibility of rehabilitation for Thomas no matter how successful he has been in not abusing alcohol or how often he has participated in alcohol abuse prevention programs. The following paragraph from the latest Board decision is a telling example of its continuing unconstitutional practice:

> Your peacetime interaction with able-bodied male prisoners while sober (since alcohol is not available in prison) is not a reliable predictor of your behavior toward defenseless women and children, your likely victims if you are released and able to consume alcohol.

Board's Decision, IV (2), at 5, A30. The Board obviously has presumed that having abused alcohol prior to his murder conviction, Thomas will always abuse alcohol regardless of his successful participation in the prison's alcohol abuse prevention programs. That presumption would preclude any possibility of rehabilitation and doom any prospect of parole. As we noted earlier, the Board was required to consider an inmate's rehabilitation under the pre-1996 regime of parole laws and guidelines. We mandated that constitutional requirements compelled the Board to duly consider pre-1996 factors showing Thomas's rehabilitation.

As Thomas shows on appeal, the Board added the category of prior history of "substance abuse" to its Guidelines around 1990 to counter illicit *drug* abuse, rather than alcohol abuse. *See* Board's 1990 Parole Decision Making Guidelines, A247 (the prior record of substance abuse history was "intended to represent a clear sanction to those who are prone to crime because of either *drug dependency* or a chosen life of crime as indicated by their habitual behavior" (emphasis added); Board's 1991 Special Report to Pennsylvania House Judiciary Committee, A258

("Although convictions for *drug law violations* were skewed toward the low end of the risk of recidivism classification, *illegal drug use* is an important underlying determinant in the etiology of crime.") (emphasis added), A277 ("Substance abuse history was added as a weighted parole consideration factor because of the increasing *drug problem.*") (emphasis added).

We believe that the Board's sudden reliance on Thomas's alcohol abuse 40 years ago and its equation of "substance abuse" with alcohol abuse since 2000 was designed to negate Thomas's parole. The Board's reliance on that factor was not only unjustifiable under the Board's guidelines and policies, but also unconstitutional because the Board retroactively applied a factor that it had suddenly found to be significant based on the amended parole statute and new policies.

The following paragraph from the Board's latest decision reveals its flagrant disregard of our prior decision and mandate:

> Note: The 1990 Guidelines *mandate* that such instances of *alcohol abuse* be added into the Guideline score and *do not allow exceptions* based on the length of incarceration or upon participation in institutional alcohol abuse programs. Evidence in the file clearly demonstrates your history of alcohol abuse; and, at your recent interview, you admitted abusing alcohol prior to conviction. *The omissions of this fact in any previously-computed 1990 Guideline Form was therefore erroneous.*

Board's Notice at 2, A30 (emphasis added); *see also* Board's Br. at 16.

The Board offers no evidence to support its assertions; undisputed evidence shows the opposite. The Board plays its card of discretionary power cynically and conveniently to suit different purposes. Before, the Board represented that it had absolute, unreviewable discretionary power in parole decision-making in order to resist federal habeas review. Now, it claims that it has no discretion in order to defy our mandate to rectify constitutional violations. If the Board had indeed had no discretion, Thomas would have been

paroled in 1997 or 1998 since the tally of the scores on the Board's Guidelines forms militated in favor of parole; on both occasions the Board exercised its discretionary power to deviate from the Guidelines and the unanimous recommendation of the corrections staff. The Board summarily denied Thomas's application despite his record of continuous good conduct, compliance with the prison's rehabilitation programs, and educational accomplishments during his 40-year-long incarceration.

### 2. Non-admission of guilt

The Board also defies our instruction to discontinue its manipulation of the hitherto insignificant factors of Thomas's non-admission of guilt and his participation only in the "denier" part of sex offender therapy program. We noted earlier that the Board had viewed these factors neutrally, even in the year 2000, and that it asserted those factors as a *post hoc* defense of its practice for the first time in its previous brief to us. The Board now has not only defied our instruction to disregard those factors, it has also gone two steps further in a continued course of constitutional violations. First, to manipulate a result of denial, the Board for the first time expressly equates a claim of innocence with remorselessness and refusal to accept responsibility, which the Board equates in turn with failure of rehabilitation and likelihood to commit new crimes if paroled. This position is flatly contrary to the Board's position in the original habeas corpus hearing when its counsel stated that Thomas had completed all sexual programs available to him.[7]

---

7. The Board's assertion is belied by its counsel's statement in the original habeas hearing before the District Court held on December 18, 2001. Thomas's attorney, Sosnov, represented to the Court that the parties had stipulated that "Mr. Thomas, both before his parole considerations in 1997 and 1998 and since, has taken and completed all [the sexual offender treatment] programs available to him through the J.J. Peters Institute." A712. The Board's attorney, Guido, represented to the court immediately thereafter: "That's correct. . . . [He has taken and completed] all programs which are available to him through the Joseph J. Peters Institute." A712. In view of its previous stipulation, the Board's assertion as to Thomas's failure to complete the sexual offender prevention program must be disregarded.

Second, as asserted by Thomas, the Board has committed a new and glaring instance of *ex post facto* violation by applying a newly enacted statute retroactively to Thomas.[8] The Board's recent requirement that Thomas participate in the "admitter" part of sex offender therapy program to qualify for parole is in essence a retroactive application of 42 Pa. Stat. Ann. § 9718.1, enacted in December 2000.[9] That statute provides that a sexual

---

8. The Board wrote in part:

> Because you have refused to accept responsibility for your crimes, you have completed only the first phase of a required three-phase sexual offender treatment program. For this reason the Board has concluded (1) that factors of risk in your case (as measured in the Guideline score) have not been sufficiently reduced by your inadequate participation in such institutional treatment and (2) that the quality of your participation does not favorably correspond with the level of risk involved. The level of risk in your case involves the danger of sexual assault and murder to women and children. The quality of your participation has been poor, because it has been remorseless and without empathy for your victim and her family.

> You have consistently refused to accept responsibility for your crimes and have shown no remorse. The Board believes that acceptance of guilt is the first and most necessary step toward rehabilitation. . . . You have not taken this first step. Nor does the Board believe that you are in any sense justified in denying guilt, since you were convicted by jury of your peers and your conviction as upheld by the Supreme Court of the Commonwealth of Pennsylvania. . . .

> Your refusal to accept responsibility for your crimes has prevented you from completing the sexual offender therapy so essential in your case.

Board's Notice, IV, at 4, A3; V (4-5), A33 (emphasis added).

9. 42 Pa. Stat. Ann. § 9718.1 (West 2003), provides in relevant part:

> (a) General rule.—A person, including an offender designated as a "sexually violent predator" as defined in section 9792 (relating to definitions), shall attend and participate in a Department of Corrections program of counseling or therapy designed for incarcerated sex offenders if the person is incarcerated in a State institution for any of the following provisions under 18 Pa. C.S. (relating to crimes and offenses): (1) Any of the offenses a enumerated

offender involving a minor "shall not be eligible for parole unless the offender has . . . participated in [the sex offender therapy program prescribed by the Department of Corrections]."[10] Even though the Board did not specify the statute in making the above requirement, there is no question that the Board's new requirement commits another instance of a continuous course of *ex post facto* violations.

### 3. "Instant offense" and "victim injury"

The Board also defies our instruction not to use the factors of "instant offense" and "victim injury" to exclude consideration of factors favoring Thomas's parole. The Board's latest decision repeated what we described earlier as its "indifference to Thomas's efforts to improve his parole candidacy" by repeatedly relying on those factors. We required the Board to balance factors favoring Thomas's parole with any "unique factors" that may weigh against

---

in Chapter 31 (relating to sexual offenses) if the offense involved a minor under 18 years of age. . . .

(b)  Eligibility for parole.—For an offender required to participate in the program under subsection (a), all of the following apply:

(1)  The offender shall not be eligible for parole unless the offender has:

(i)  served the minimum term of imprisonment;

(ii)  participated in the program under subsection (a); and

(iii)  agreed to comply with any special conditions of parole imposed for therapy or counseling for sex offenders, including sexually violent predators. . . .

Section 3 of Act No. 2000-98 (December 20, 2000), P.L. 721, No. 98, provides in relevant part:

This act shall apply as follows:

(1)  [T]he addition of 42 Pa.C.S. § 9718.1 shall apply to offenses committed on or after the effective date of this act.

10. It is not disputed that one part of the prescribed J.J. Peters Institute program required admission of guilt and that Thomas did not participate in that part.

parole, factors that were not already incorporated into the Guidelines forms. The Board failed to comply with our instruction and again "defaulted in its duty to consider factors other than the underlying offense and risk to public safety." *Mickens-Thomas I*, at 388. Defying our instruction, the Board used the above two factors in the same old manner to foreclose any consideration of factors showing Thomas's rehabilitation and accomplishments. The Board wrote:

> There are no meaningful circumstances countervailing the Guideline recommendation to refuse parole
>
> . . . .
>
> Your educational achievement and lack of assaultive behavior while in prison do not alter this conclusion, for the following reasons:
>
> (1) Your assaultive sexual behavior, not your lack of education, has caused your present predicament. Sexual criminality and higher education are not mutually exclusive, since your sexual problems have not been adequately addressed, you remain, in the Board's opinion, a dangerous sexual offender, whatever your education.

Board's Notice, IV, at 4-5, A31-32.

In the same manner of its *post hoc* rationalization of Thomas's prior history of alcohol abuse, the Board uses the historical factors of "instant offense" and "victim injury" to foreclose any possibility of parole, in an apparent effort to circumvent the constitutional *ex post facto* prohibitions. The Board's use of the historical factors for this purpose is also tantamount to nullifying Thomas's commutation and resentencing him to life imprisonment without eligibility of parole in violation of the Pennsylvania pre-1996 law and parole guidelines.

*4. Other factors not previously relied upon*

The Board's latest decision went further in relying on historical information not previously relied upon in its effort to circumvent our mandate to rectify its *ex post facto* violations.[11] The Board had never used Thomas's 58-year-

---

11. The Board wrote:

> Other factors (*not counted in 1990 Guideline score*) which indicate

old juvenile offense and other dismissed charges, arrests, and uncharged accusations in its previous decisions. The Board also relies now on hearsay statements from Thomas's former wife for the first time to justify its decision. Those new factors, never used by the Board before, are not worthy of consideration because they appear to have been designed to achieve a non-parole decision and also obscure *ex post facto* prohibitions. *Mickens-Thomas I,* at 390.

C.

In our earlier opinion, we did not have occasion to consider whether the history of the Board's adjudication of Thomas's parole applications over the years had shown a pattern of unconstitutional retaliation or vindictiveness against Thomas for his initiation of state and federal legal actions challenging the Board's actions. A renewed look at the Board's pattern of adjudicating Thomas's parole applications has raised sufficient inferences of retaliation or vindictiveness.

A review of the history of the parole application shows that after each time Thomas brought an action to challenge

---

that parole should be denied:

(1) You have a history of multiple prior assault arrests, including the following:

A. In 1945 you were arrested for rape (juvenile).

B. In 1959 you were charged with choking a pregnant woman with a scarf, until she passed out.

C. In 1959 you were also accused of attacking a 14-year old babysitter, with your pants removed and she fighting to get free.

D. In 1961 you were accused of assault with a black jack.

(2) Statements from your former wife indicate that when you drank you always wanted to engage in sodomy and would beat and choke her if she refused to comply.

(3) Your anger and resentment toward women was evident in your recent interview.

Board's Notice, V, at 5-6, A32-33 (emphasis added).

the Board's *ex post facto* violations, the Board resorted to factors not previously considered relevant or significant in order to reach parole denial. As we noted earlier, the Board initially refused to consider Thomas's parole application when he became eligible for parole in July 1996 because of the Board's determination that a newly enacted statute required an otherwise eligible parole applicant to serve a year in a pre-release center before applying for parole. After Thomas successfully brought the state mandamus action in November 1996 for the *ex post facto* violation, the Board summarily denied his first parole application despite his record of consistent good behavior, substantial accomplishments, unanimous support from the corrections staff, the weight of gubernatorial commutation, the Board of Pardons' commutation recommendation to the Governor, and the Board's own Guidelines-based scores militating in favor of parole.

The Board's initial refusal to consider Thomas's parole application cost him one full year before his application was heard. The Board summarily denied Thomas's second parole application in 1998, after Thomas filed a state habeas petition with the Pennsylvania Supreme Court, even though he had satisfied every precondition suggested by the Board, maintained a continued record of good behavior, unanimous support, and the Guidelines' score favoring parole. Soon after Thomas brought the underlying federal habeas action in December 1999, the Board denied Thomas's third application in March 2000 by suddenly relying on Thomas's alcohol abuse 40 years ago to tilt the Guidelines-based risk scores against parole. At that point, the tally of risk scores disfavored parole for the first time.

In appealing from the District Court's earlier grant of conditional habeas relief, the Board suddenly resorted to Thomas's non-admission of guilt and non-participation in the "admitter" part of sex offender therapy programs to justify its unconstitutional conduct. Finally, on this appeal, the Board suddenly used the historical information of Thomas's alleged juvenile misconduct 58 years ago prior to his incarceration, and hearsay statements from Thomas's former wife ostensibly to show "compliance" with our earlier instruction to it to consider "unique factors" that may weigh against parole.

It is not disputed that the Board had been aware of those newly added factors and information. However, it had not deemed them to be relevant or significant before each denial of parole or appearance before the District Court or this Court. The sudden, *post hoc* and retrospective use of those factors in response to Thomas's challenges in the state and federal courts raises a sufficient inference of unconstitutional retaliation or vindictiveness. In *Marshall v. Lansing*, 839 F.2d 933, 947-48 (3d Cir. 1988), we held that there was a sufficient "inference of retaliation" when the United States Parole Commission imposed an administrative punishment on a petitioner *after* he successfully appealed the Commission's determination of his offense severity index for an earlier marijuana usage that the Commission had reviewed but imposed no punishment. We observed that the Commission did not choose to exercise its discretion to penalize the petitioner for his marijuana usage until *after* he had challenged its determination in court. *Id.* We held that

> the Commission's *unexplained* decision to add two months to [the petitioner's] term of incarceration because of conduct that occurred *before* the time of the original sentencing proceeding . . . which it ignored until its parole release determination was judicially put into question, creates a sufficient appearance of vindictiveness to justify voiding the penalty.

*Id.* at 948 (citation omitted) (emphasis in original).

We similarly conclude here that the Board's use of known but hitherto uncounted historical factors *after* Thomas brought state and federal actions has created "a sufficient appearance of vindictiveness to justify voiding" any consideration of those newly added factors. Those factors are not only unworthy of consideration, but also raise a "presumption of vindictiveness" on the part of the Board. *See id.* at 947. Nothing in the record or the Board's briefs rebuts the presumption of vindictiveness; the Board's thinly veiled excuse of error for its non-consideration of Thomas's prior history of alcohol abuse reinforces the presumption of vindictiveness. Furthermore, "[t]he combination of the [Board's] failure to comply with [our instructions] and the appearance of vindictiveness in imposing a penalty for [the]

previously-ignored [prior history of alcohol abuse] only after a successful appeal . . . raises an inference of bad faith on the part of the [Board]." *Id.* at 950. The Board's thinly veiled excuse of error leaves us with no doubt of its bad faith and willfulness in its defiance of our mandate and instructions.

### D.

From the very first time we heard the initial appeal by the Board to this Court, we have carefully refrained from intruding on the Board's discretionary powers. We stated that we were "exceedingly reluctant to usurp the Board's functions" and expressed the hope that on remand "the Board will not be defensive, but instead will fairly consider Thomas's application in the light of our observations and *ex post facto* prohibitions." *Mickens-Thomas I*, at 393. Our hopes, however, were illusory. We expected Board sensitivity to respect constitutional concerns. The combination of willful noncompliance, bad faith, and a sufficient inference of retaliation or vindictiveness on the part of the Board convinces us that it would be futile to further remand Thomas's parole application to the Board for a fair disposition under the pre-1996 regime of parole laws and guidelines.

We, therefore, conclude that the appropriate remedy under these circumstances is to grant Thomas unconditional habeas corpus relief. *See Bridge v. United States Parole Commission*, 981 F.2d 97, 105 (3d Cir. 1992) (quoting *Billiteri v. United States Board of Parole*, 541 F.2d 938, 944 (2d Cir. 1976); *Billiteri*, at 944 ("The only remedy which the court can give is to order the Board to correct the abuses or wrongful conduct within a fixed period of time, after which, in the case of non-compliance, the court can grant the writ of habeas corpus and order the prisoner discharged from custody."); *Billiteri*, at 946 ("If the case was before the court on a petition for habeas corpus, it may order compliance within a reasonable period, failing which it may order the petitioner discharged from custody."); *Thompson v. Armontrout*, 808 F.2d at 28, 31-32 (8th Cir. 1986), *cert. denied*, 481 U.S. 1059 (1987) (affirming the federal District Court's grant of unconditional habeas corpus relief to a Missouri state inmate upon finding of

vindictiveness on the part of the state parole board in denying the inmate's parole application following the inmate's successful challenge of his prior conviction).

## IV.

The judgment of the District Court denying Thomas's motion for unconditional habeas relief is hereby vacated. The case is remanded to the District Court with directions to order Donald Vaughn, Superintendent of the Pennsylvania State Correctional Institution at Graterford, and the Parole Board to release Thomas on parole within seven (7) days of their receipt of the District Court's order. The mandate of the Court shall issue forthwith.

A True Copy:
      Teste:

                    *Clerk of the United States Court of Appeals*
                            *for the Third Circuit*