

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-7-2005

# Mickens-Thomas v. Martinez

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3843

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Mickens-Thomas v. Martinez" (2005). *2005 Decisions.* Paper 885.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/885

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

———

NO. 04-3843

———

LOUIS MICKENS-THOMAS,

Appellant

v.

BENJAMIN A. MARTINEZ, CHAIRMAN, PENNSYLVANIA
BOARD OF PROBATION AND PAROLE, IN HIS OFFICIAL CAPACITY;
LARRY POLGAR, DISTRICT DIRECTOR, ALLENTOWN DISTRICT OFFICE,
PENNSYLVANIA BOARD OF PROBATION AND PAROLE, IN HIS OFFICIAL
CAPACITY; JOSEPH SMITH, DISTRICT DIRECTOR, SCRANTON OFFICE,
PENNSYLVANIA BOARD OF PROBATION AND PAROLE, IN HIS
OFFICIAL CAPACITY; RAYMOND J. DADIGAN, CENTRAL REGIONAL
DIRECTOR, PENNSYLVANIA BOARD OF PROBATION AND PAROLE,
IN HIS OFFICIAL CAPACITY; BRIAN ELLIOTT, DIRECTOR, DEPARTMENT
OF CORRECTIONS, ALLENTOWN COMMUNITY CORRECTIONS CENTER IN
HIS OFFICIAL CAPACITY

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 04-cv-01615)
District Judge: Hon. Ronald L. Buckwalter

———

Submitted Under Third Circuit LAR 34.1(a)
June 15, 2005

Before: SLOVITER, McKEE and ROSENN, Circuit Judges

(Filed          July 7, 2005                )

———

OPINION

SLOVITER, Circuit Judge.

Appellant Louis Mickens-Thomas ("Thomas") appeals from the order of the United States District Court for the Eastern District of Pennsylvania denying his motion for a preliminary injunction. The Appellees are Benjamin A. Martinez, the Chairman of the Pennsylvania Board of Probation and Parole ("Board"), Larry Polgar, the District Director of the Board's Allentown office, Joseph Smith, the District Director of the Board's Scranton office, Raymond Dadigan, the Board's Central Regional Director, and Brian Elliot, an official with the Pennsylvania Department of Corrections.

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343; this court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). For the reasons explained below, we will affirm.

**I.**

We have previously set forth in great detail the underlying facts of this case. See Mickens-Thomas v. Vaughn, 355 F.3d 294 (3d Cir. 2004) ("Mickens-Thomas II"); Mickens-Thomas v. Vaughn, 321 F.3d 374 (3d Cir. 2003) ("Mickens-Thomas I"). Thus, we will recount only such detail as is necessary for resolving the instant dispute.

Thomas received a sentence of mandatory life in prison for the 1964 rape and murder of a twelve-year-old girl. Mickens-Thomas I, 321 F.3d at 376. In 1995, the Pennsylvania Governor commuted Thomas' mandatory life sentence to a term of "31

2

years, 9 months, 6 days to life," thereby rendering Thomas eligible for release on parole. Mickens-Thomas II, 355 F.3d at 296 (internal quotations omitted).

Although Thomas thereafter made several applications for parole, the Board denied them all. Mickens-Thomas II, 355 F.3d at 296-98. As a result, Thomas invoked the jurisdiction of the federal courts and applied for a writ of habeas corpus. Eventually, this court found that the Board had violated Thomas' rights under the Ex Post Facto Clause of the United States Constitution, see U.S. Const. art. I, § 10 cl. 1, because it had applied the standards governing parole applicable after a 1996 statutory revision. We therefore granted Thomas conditional relief on his motion for habeas corpus and directed the District Court to remand the matter to the Board for further proceedings consistent with our mandate. Mickens-Thomas I, 321 F.3d at 393. The District Court in turn remanded Thomas' parole application to the Board for a hearing pursuant to the pre-1996 standards of the governing parole statute.

On remand, the Board again denied Thomas' application for parole, and Thomas once again sought relief in the federal courts. The District Court denied habeas but, on appeal, we granted Thomas' motion for unconditional habeas corpus relief and ordered the Superintendent of the Pennsylvania State Correctional Institute at Graterford to release Thomas on parole. Mickens-Thomas II, 355 F.3d at 310. We found that the Board had shown "willful noncompliance" with our previous order in Mickens-Thomas I and had acted in "bad faith" and in a manner sufficient to support an "inference of

3

retaliation or vindictiveness on the part of the Board" towards Thomas. Mickens-Thomas II, 355 F.3d at 310. As a result of our order in Mickens-Thomas II, Thomas was released from prison in January 2004.

After Thomas was released on parole, he submitted to the Board a "home plan" that set forth his proposed living arrangements. In this plan, Thomas proposed to live with his nephew, Calvin Mickens, his nephew's wife, Catherine Mickens, and the Mickens' adult son in their home in Pocono Country Place, a so-called "gated-community" located in Monroe County, Pennsylvania.

Michael Baker, a parole agent with the Board's Scranton office, visited Pocono Country Place and met with the Mickenses. He further spoke with local law enforcement officials in Monroe County. After conducting this investigation, Baker recommended rejection of Thomas' proffered home plan.

Appellee District Director Smith concurred in Baker's recommendation. According to Smith, he objected to Thomas' home plan because of the large number of children who live in Pocono Country Place, as well as the fact that Thomas would be left unsupervised in the house during the work week. Although both Calvin and Catherine Mickens have careers in the mental health field, their jobs require them to be away from home from approximately 1:00 p.m. to 2:00 a.m. every day that they work. Ultimately, by way of a letter dated August 13, 2004, the Board affirmed the denial of Thomas' proposed home plan.

4

Meanwhile, Thomas had been provided with a list of Board-approved apartments, all of which were located in Allentown, Pennsylvania. Thomas chose to live in an apartment on Hamilton Street in Allentown where he still resides pending the outcome of this litigation.[1] We note that Allentown is approximately fifty miles from Monroe County, but Thomas must have permission from his parole supervisor to leave Allentown.

On April 4, 2004, Thomas filed a Complaint in the District Court alleging that, by refusing to allow him to live with his family, the defendants were violating his constitutional rights. Thomas also filed on that date a Motion for Preliminary Injunction in which he moved the District Court to issue an order requiring the Board to allow him to live with his nephew in Monroe County while the litigation was pending.

The District Court held hearings on the injunction motion on April 19 and July 29, 2004. On August 27, 2004, the District Court entered a Memorandum and Order denying Thomas' Motion for Preliminary Injunction. On September 27, 2004, Thomas lodged this timely appeal.

## II.

In reviewing the disposition of a preliminary injunction motion, we review "the

---

[1] As found by the District Court: "[Thomas'] parole supervision [in Allentown] consists of visits by his parole officer three or four times a month. Other than that, no one supervises him in any sense of the word." App. at 8. The District Court further found that Thomas' Allentown apartment is located near several schools and daycare centers.

5

District Court's conclusions of law in a plenary fashion, its findings of fact under a clearly erroneous standard, and its decision to grant or deny an injunction for abuse of discretion." Warner-Lambert Co. v. Breathasure, Inc., 204 F.3d 87, 89 n.1 (3d Cir. 2000) (internal quotations and citations omitted); see also McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ., 24 F.3d 519, 523 (3d Cir. 1994). Four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. Am. Civil Liberties Union of N.J. v. Black Horse Pike Reg'l Bd. of Educ., 84 F.3d 1471,1477 n.2 (3d Cir. 1996) (en banc). Furthermore, we have noted that "when the preliminary injunction is directed not merely at preserving the status quo but, as in this case, at providing mandatory relief, the burden on the moving party is particularly heavy." Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980).

In considering the probability of the movant's success on the merits, we note that several of Thomas' claims are novel. For example, Thomas asserts that the Board's refusal to allow him to live with his nephew violates his constitutional right to free association and his substantive due process right to live with his family. However, neither the United States Supreme Court nor this court have ever held that a parolee has a

6

constitutional right to live with family members or associate with whomever he or she pleases. Indeed, the Supreme Court has noted with approval the fact that "parolees are [typically] forbidden . . . to have associations or correspondence with certain categories of undesirable persons . . . [and] [t]ypically. . . must seek permission from their parole officers before engaging in specified activities, such as changing . . . living quarters . . . ." Morrissey v. Brewer, 408 U.S. 471, 478 (1972). We do not suggest that the Mickenses fall within the category of "undesirable persons" referred to in Morrissey, but merely that the Board has wide control over a parolee's associations. The District Court noted the paucity of legal support for Thomas' substantive due process and associational-right claims, and reasonably concluded that those claims do not have a reasonable likelihood of success on the merits.

In pursuing his request for an injunction with respect to his living arrangements, Thomas also argues that the Board violated his ex post facto rights because it focused solely on safety without consideration of rehabilitation, one of the guiding purposes of the pre-1996 statutory scheme. The Pennsylvania Supreme Court has recently held that "the 1996 [parole] amendment may be shown to violate the ex post facto clause if an inmate is able to demonstrate that the 1996 amendment, as applied to him, creates a significant risk of prolonging his incarceration." Cimaszewski v. Pa. Bd. of Prob. & Parole, 868 A.2d 416, 427 (Pa. 2005).

However, Thomas cites no precedent to support his position that the Board's

7

determination with respect to his living arrangement presents a potential Ex Post Facto Clause violation. Indeed, the decisional law indicates that generally, in order to violate the Ex Post Facto Clause, a law must increase punishment. Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 508-09 (1995); Collins v. Youngblood, 497 U.S. 37, 42 (1990). Thus, with respect to parole, the United States Supreme Court has emphasized that not every retroactively applicable statutory change creating a risk of affecting a parolee's terms or conditions is prohibited. Morales, 514 U.S. at 508-09. Instead, the controlling inquiry in parole cases is whether the retroactive application of a later-instituted law or policy would create "a sufficient risk of increasing the measure of punishment attached to the covered crimes." Id. at 509; see also Garner v. Jones, 529 U.S. 244, 250 (2000). Stated otherwise, in order to violate the Ex Post Facto Clause, a statutory or policy change generally must "alter[] the definition of criminal conduct or increase[] the penalty by which a crime is punishable;" the fact that a law simply operates to the general "disadvantage" of a parolee (or parole seeker) is insufficient. Morales, 514 U.S. at 506 n.3.

The dissent agrees with the legal principle, but nonetheless persists in its argument that the Ex Post Facto Clause applies to the Board's discretionary decision as to the residence of the parolee. None of the cases cited by the dissent for their general language so holds, or even suggests, that the dissent's view represents the applicable law.

We need not decide at the preliminary injunction stage the extent to which the

8

Board's rejection of a parolee's home plan implicates the Ex Post Facto Clause. We merely note that it can be argued that such a determination does not relate to "punishment." It is sufficient to note that the above-cited cases suggest that Thomas does not enjoy a reasonable likelihood of success on the merits of his claim that the Board's actions with respect to his living arrangement violated his ex post facto rights.

On the other hand, one of Thomas' arguments stands on a more secure legal footing. It is well-established that vindictive or retaliatory governmental conduct violates due process. See North Carolina v. Pearce, 395 U.S. 711, 725 (1969); Marshall v. Lansing, 839 F.2d 933, 947 (3d Cir. 1988). Thomas alleges that in denying his home plan, the Board acted vindictively. Indeed, the District Court noted that an "inference of retaliation or vindictiveness could arise from what appears to be a distinction without a substantial difference in the home plan the Board rejected and the one it would approve." App. at 9. The District Court's suspicion that Thomas' proposed home plan vis-a-vis his current living situation in Allentown constituted "a distinction without a substantial difference" is not completely unwarranted. Both living quarters are near schools and daycares, both are in rising-crime areas, and both leave Thomas unsupervised for the great majority of his time.

The District Court, however, ultimately found that Thomas' proffered evidence did not support a finding of retaliation or vindictiveness on the part of the Board in rejecting the home plan. On the current state of the record, this factual finding was not clearly

erroneous; thus, the District Court's resultant conclusion regarding Thomas'

ultimate likelihood of success on the merits of his due process/retaliation claim was not

unreasonable.

Nor do we have a basis on this record to reject the District Court's holding that

granting Thomas' motion for a preliminary injunction would likely cause harm to the

nonmoving party and would not be in the public's interest. Black Horse Pike Reg'l Bd.

of Educ., 84 F.3d at 1477 n.2. The Board has determined that allowing Thomas to live at

Pocono Country Place rather than in Allentown would increase the risk to the public. The

Board, a state-level and executive-branch entity, has an obvious interest in not being

micromanaged by the federal courts; likewise, the public interest is furthered by allowing

the experienced penal officers at the Board – rather than this court – to make parole

decisions.[2]

Finally, the District Court found that denial of Thomas' motion would not cause

him irreparable injury. During the July 29, 2004 hearing, Parole Officer Anthony

Mondello, who supervises Thomas, testified regarding a conversation he had with

Thomas:

I ask [Thomas] basically how he's doing every time I go there [the

_____

[2] Of course, our concern for deference and comity would be negated on a finding that the Board acted in a vindictive or otherwise unconstitutional manner. As discussed above, however, the District Court reasonably concluded that the record as currently composed does not support such a finding.

10

apartment in Allentown], of course, and he expresses to me that he likes it. The last time I spoke with him he said he was considering not even moving because he liked it so much.

App. at 113. Referencing this testimony, the District Court found that Thomas "himself is clearly ambivalent about what he really wants." App. at 12. Considering that the District Court found Thomas to be "ambivalent" about his housing situation (a finding that is not clearly erroneous), it can hardly be said that maintaining the status quo and leaving Thomas to live in Allentown during the pendency of the District Court litigation would work an irreparable injury.

We are not insensitive to the many arguments vigorously set forth on Thomas' behalf by his appellate counsel, particularly the argument that it is considerably more costly for Thomas to live in a rented apartment in Allentown rather than rent free with his nephew. However, we do not review state parole decisions de novo. Ours is a very limited scope of review, and we must tread lightly. It is possible that with the passage of a year the parties may have changed their positions. Thomas may have found that being in a city such as Allentown offers him more options for diversion than the more rural area where his nephew is situated. On the other hand, the Board may decide that Thomas' move to Monroe County is no longer adverse to the public interest. Cf. 37 Pa. Code § 65.4 (requiring parolee to "[o]btain the written permission of the parole supervision staff before changing his residence"). Those are considerations we leave to the Board and the District Court in the first instance.

11

In sum, and considering that Thomas' "preliminary injunction [was] directed not merely at preserving the status quo but . . . at providing mandatory relief," Carter, 621 F.2d at 582, we hold that the District Court did not abuse its discretion in denying the Motion for Preliminary Injunction.[3]

## III.

For the above stated reasons, we will affirm the order of the District Court.

---

[3] Citing Daubert v. Merrell Dow Pharms., 509 U.S. 579 (1993), and Fed. R. Evid. 702, Thomas argues that the District Court abused its discretion in admitting the expert testimony of Dr. Veronique Valliere during the July 29, 2004 hearing. However, even assuming arguendo that the District Court abused its discretion in admitting Dr. Valliere's testimony, any such error was harmless because the District Court barely mentioned, let alone relied on, the challenged testimony in reaching its decision.

ROSENN, Circuit Judge, dissenting.

Because I believe the district court overlooked important aspects of the record that demonstrate that the appellees continue to ignore Mickens-Thomas's rights under the Ex Post Facto Clause of the United States Constitution, I respectfully dissent.

Although this is an appeal from an order denying a preliminary injunction, it cannot be divorced from the extensive habeas corpus proceedings that have preceded this latest chapter in Mickens-Thomas's paroles. As the majority notes, we found "that the Board had shown 'wilful non-compliance' with our previous order in Mickens-Thomas I and had acted in 'bad faith' and in a manner sufficient to support 'an inference of retaliation or vindictiveness on the part of the Board' towards Mickens-Thomas." Ante at 3-4 (quoting Mickens-Thomas v. Vaughn, 355 F.3d 294, 310 (3d Cir. 2004) ("Mickens-Thomas II")). This context must frame our interpretation of the Board's decision to deny Mickens-Thomas's proposed residence.

Of course, I agree with the majority that the Board has an obvious interest in not being micromanaged by the federal court. This court likewise has no interest in micromanaging or time to micromanage Board decisions regarding the monitoring of parolees. On the other hand, we do have an obligation to review the monitoring activities of the Board that violate federal constitutional prohibitions. In our latest opinion in the habeas corpus proceedings, we noted that Mickens-Thomas's rehabilitation activities while in prison had earned the unanimous support of the prison correction officers and all

voting members of the Department of Corrections Institutional Staff. Mickens-Thomas II, 355 F.3d at 297-98. In addition, Mickens-Thomas consistently maintained a record of good behavior, participated in sex therapy and alcohol abuse prevention programs, and complied with all of the Board's requirements. Id. at 298. Therefore, in our mandate to the Board to rectify its ex post facto violations, we explicitly stated:

> The pre-1996 policies place significant weight on factors relating to an inmate's potential to adapt to life on the outside, and on the recommendations of the institutional staff. The pre-1996 policies suggest that no single factor should be controlling in a decision to deny parole to an applicant. Moreover, the pre-1996 Decision Making Guidelines were given significant, although not dispositive weight. A departure from the Guidelines required a recitation of unique factors, outweighing those in the Guidelines analysis. The Board Decisions on each of Thomas's parole hearings rely heavily on 'high assaultive behavior potential,' which relates primarily to the nature of the original offense, despite many other significant factors favoring parole.

Mickens-Thomas II, 355 F.3d at 302-03 (quoting Mickens-Thomas v. Vaughn, 321 F.3d 374, 388 (3d Cir. 2003)) (emphasis in original).

Despite this mandate, the record in this injunctive segment of the Mickens-Thomas saga reveals that the Board continues to focus on the public safety risks in total disregard of almost forty years of prison rehabilitation and an excellent record of compliance with all programs prescribed by the Department of Corrections. These were important factors which, prior to 1996 and the changes in the Board's Guidelines and parole policies, were entitled to weight in balancing the prisoner's rehabilitation and liberty interest with the interest of public safety. See 61 P.S. § 331.1 (1941) (amended 1996). Instead, the Board, in reviewing the parole period, continues to emphasize an overriding consideration of

public safety and a total disregard of the programs it required of Mickens-Thomas in his rehabilitation.

In rejecting Mickens-Thomas's plan to live with his nephew and niece in a gated community in the Poconos of Pennsylvania, parole agent Baker's overriding concern was the risk to the community posed by Mickens-Thomas's presence, even though his designated residence in Allentown is also near homes of children and closer to public schools. The nephew with whom Mickens-Thomas planned to live is a safety and security officer at the Kirby Forensic Psychiatric Center of New York City, where he supervises eleven officers. (AR 37) His wife is also employed as a supervisor working with the mentally handicapped. They both leave for work five days a week at 1 p.m. and return home after midnight. According to parole agent Baker, who was very familiar with the Pocono area, the nearest school was "probably about six miles away," (AR 61) although a number of children live in the community. Baker also considered the area to be afflicted with a rising crime rate. (AR69)

Baker found nothing unacceptable about the Mickens family with whom Mickens-Thomas proposed to live, or in the condition of their home. Nor had Baker interviewed Mickens-Thomas before recommending a rejection of the Pocono home proposal. (AR75) Baker's apprehension was predicated, in part, on his concern that the Mickens' work schedule provided them little, if any, opportunity to supervise and monitor Mickens-Thomas.

However, the Allentown residence which the Board recommended for Mickens-

Thomas has even <u>less</u> supervision and monitoring because Mickens-Thomas lives alone in an apartment without anyone to supervise or monitor him except his parole agent, Anthony Mondello, who sees him but three or four times a month. Furthermore, the Board ignored the even greater risk posed to children in Allentown where schools and children are near Mickens-Thomas's residence and where he lacks the supervising presence of any family on weekends or after they return from work.

To bolster its decision, the Board relies on the testimony of Dr. Veronique Valliarc, a psychologist licensed in Pennsylvania since 1995. The Board argues that Dr. Valliarc's observations parallel those of parole agents Baker and Mondello. However, neither the agents nor Dr. Valliarc gave any consideration to the numerous rehabilitation programs structured by the State in which Mickens-Thomas participated and satisfactorily completed during his almost forty years of incarceration. The agents and Dr. Villiarc made their recommendations and the Board approved them on the supposition that Mickens-Thomas lived in a vacuum for the past forty years and received no benefit from the numerous rehabilitation programs administered to him by the State. They also ignored that Mickens-Thomas was now nearly eighty years of age and in poor health.

Dr. Villiarc's testimony, like the Board's apprehensions, focused narrowly on the risk of recidivism, even though our mandate on Mickens-Thomas's parole release directed the Board to balance his rehabilitation and liberty interest with the interest of public safety. Dr. Villiarc emphasized the word "risk" frequently in her testimony. (A160) The district court even noted her use of the term "a lot." (A162) However, she

never considered the greater risk of Mickens-Thomas living alone, day after day, seven days a week, without any family in sight for even part of the day. Dr. Villiarc acknowledged her testimony did not focus specifically on Mickens-Thomas and his family but rather was a statement of "general principles." She never investigated the home of Calvin Mickens and his family where Mickens-Thomas planned to live and never even visited the community. (A165)

Dr. Villiarc conceded that her testimony never addressed this specific case or the Pocono community. She admitted that a "significant period of treatment" could affect her assessment of the offender's risk. (A165) She acknowledged that "I do not know anything about this particular case at all, what parole has done or not done." (A167) Dr. Villiarc gave an unsupported opinion predicated in large part on an unreasoned decision of parole agent Baker. The trial court aptly summarized her testimony with the statement, "She doesn't know anything about the family or anything." (A 167-68)

The Board's decision to reject Mickens-Thomas's plan to live with family, compelling him to live alone in an apartment in Allentown, amounts to nothing more than an extension of the Board's post-1996 policy of elevating concern for public safety over the parolee's rehabilitation and liberty interest. There is no evidence that the parole agents, the Board, or Dr. Villiarc ever reviewed the rehabilitation record of Mickens-Thomas in arriving at the decision to reject his plan to live with his nephew and niece. There is no evidence that they ever weighed Mickens-Thomas's record of rehabilitation, his excellent compliance with the state rehabilitation programs, and his liberty interest

with the Board's concern for public safety.  The Board summarily discarded the results of

its extensive rehabilitation programs for Baker's speculative, shallow, and superficial

recommendation.  This complete disregard of the Board's own programs designed to

prepare a prisoner for life after prison constitutes a constitutional denial of due process.

The decision of the district court also makes no reference to Mickens-Thomas's

prison rehabilitation or the benefits that, no doubt, inhere from living with family.  As the

Supreme Court has acknowledged, the sanctity of the family should be protected because

> it is through the family that we inculcate and pass down many of our most
> cherished values, moral and cultural. . . .  The tradition of uncles, aunts,
> cousins, and especially grandparents sharing a household along with parents
> and children has roots equally venerable and equally deserving of
> constitutional recognition.  Over the years, millions of our citizens have
> grown up in just such an environment, and most, surely, have profited from
> it. . . . Especially in times of adversity such as the death of a spouse or
> economic need, the broader family has tended to come together for mutual
> sustenance and to maintain or rebuild a secure home life.

Moore v. City of East Cleveland, 431 U.S. 494, 503-505 (1997) (citations omitted).

In Drollinger v. Milligan, 552 F.2d 1220 (7th Cir. 1977), a state probationer

challenged as unconstitutional certain conditions of her probation.  On appeal to the

Seventh Circuit, that court, also in a habeas corpus proceeding, reversed the district court

and granted an injunction enjoining the enforcement of terms and conditions of probation

which affected the right of the grandfather to care for his paroled granddaughter.  In so

doing, the court noted the importance of the family unit and acknowledged that "the

integrity of the family unit has been afforded the protection of due process of law."  Id. at

1227.  The court went on to note that "the state can restrict the exercise of this right by

family members only if it can demonstrate" an interest of "overriding significance." Id.

This decision shows that Mickens-Thomas has a reasonable probability of success on the merits and that he will be irreparably injured by the denial of relief. Furthermore, it demonstrates that granting the relief Mickens-Thomas seeks will be in the public interest because it rejects the denial of due process and implements the State's rehabilitative programs.

The majority cites Cimaszewski v. Pa. Bd. Of Prob. & Parole, 868 A.2d 416, 427 (Pa. 2005) for the proposition that the Ex Post Facto Clause is not violated unless an inmate is able to demonstrate that Pennsylvania's 1996 parole amendment creates a significant risk of prolonging his incarceration. Cimaszewski is inapplicable, however, because it addressed the situation where an incarcerated inmate files a writ of mandamus to compel the Board to grant him parole. The case did not deal with the issue before us – the retroactive application of the Board's post-1996 recidivist policy to the parole conditions of an inmate who is already released.

To be sure, in order to violate ex post facto, a law must do more than simply operate to a prisoner's disadvantage. Ca. Dept. of Corr. v. Morales, 514 U.S. 499, 506 n.3 (1995). As the majority notes, the law must retroactively increase the punishment of the prisoner. Id. However, the retroactive increase of punishment is not the only situation prohibited by the Ex Post Facto Clause. It includes other circumstances, such as altering the quantum of evidence required to convict. Stogner v. California, 539 U.S. 607, 615 (2003) (endorsing four categories of ex post facto laws). And punishment

extends beyond incarceration to include parole and probation. Korematsu v. United States, 319 U.S. 432, 435 (1943) ("[A] probation order is an authorized mode of mild and ambulatory punishment, the probation being intended as a reforming discipline.") (internal quotations and citation omitted). Thus, the Supreme Court has noted that the ex post facto prohibition extends to laws which retroactively change the conditions of a prisoner's parole. Garner v. Jones, 529 U.S. 244, 249 (2000) ("Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of this precept [against retroactively increasing punishment].").

Our previous decisions in this case have established that the Board violated the Ex Post Facto Clause by focusing primarily on the recidivist policy of the 1996 parole amendment. The record on appeal demonstrates that the Board continues improperly to focus on that policy in designating that Mickens-Thomas shall reside in a community where, of necessity, he must live alone and barely make ends meet. In so doing, the Board's course of conduct deprives Mickens-Thomas of the opportunity to live with his family and receive the important care and support they can provide. Such an order is not trivial or procedural or innocuous, but disregards the pre-1996 policy that emphasizes rehabilitation.

The incidents of discretion that the Board provides "does not displace the protections of the Ex Post Facto Clause . . . . The danger that legislatures might disfavor certain persons after the fact is present even in the parole context, and the Court has stated that the Ex Post Facto Clause guards against such abuse." Garner, 529 U.S. at 253

(citations omitted).  The continuous retroactive imposition of the Board's post-1996 recidivist policy upon Mickens-Thomas is more punishing than conditions under the previous policy because it deprives him of the salutary benefits of living with his family, rent free, and ignores his record of rehabilitation.

Accordingly, for the foregoing reasons, I would reverse the order of the district court and grant the injunction.